UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MARCI WALTERS,
            Plaintiff,

                                                    No. 1:08-cv-1107

-v-

                                                    HONORABLE PAUL L. MALONEY

PRIDE AMBULANCE CO.,
            Defendant.


*(Amended as to Page 21only)*
OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

       Plaintiff Marci Walters alleges Defendant Pride Ambulance Company violated her rights

under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601, *et seq.*, and under the

Michigan Whistleblowers' Protection Action (WPA), M.C.L. § 15.361, *et seq.* Plaintiff Walters

(Plaintiff or Walters) worked for Defendant Pride Ambulance Company as a collections clerk from

August 2005 until September 2008. Defendant Pride Ambulance (Defendant or Pride Ambulance)

provides ambulance services as well as other transportation services for the elderly and disabled in

Kalamazoo, Michigan. Defendant Pride Ambulance also offered similar services, for a time,

through a subsidiary in Nashville, Tennessee. Plaintiff tendered her resignation "under duress," on

September 9, 2008. Plaintiff filed a lawsuit against Defendant in the Circuit Court of Allegan

County on October 23, 2008. Defendant was served on October 28, 2008. Defendant filed an

answer to the complaint and affirmative defenses on November 17, 2008. On November 26, 2008,

Defendant filed a notice of removal, removing the action to this court. This court's jurisdiction

arises under 28 U.S.C. § 1331, the provision governing federal questions. This court has

supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

       Defendant filed a motion for summary judgment seeking dismissal of all claims. (Dkt. No.

33.) Plaintiff filed a response. (Dkt. No. 39.) Defendant filed a reply. (Dkt. No. 40.) The parties appeared for oral argument on December 14, 2009. At the court's request, the parties filed additional briefs outlining the chronology of relevant events. (Dkt. Nos. 44 and 45.)

STANDARD OF REVIEW

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, show there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c); *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008). The burden is on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case. *Bennett v City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The facts, and the inferences drawn from them, must be viewed in a light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (quoting *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Once the moving party has carried its burden, the nonmoving party must set forth specific facts showing there is a genuine issue for trial. FED. R. CIV. P. 56(e); *Matsushita*, 475 U.S. at 574. The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

BACKGROUND

Pride Ambulance is a private corporation, wholly owned by Ron Onderlinde. (Tim Onderline Dep., 14-15.) Tim Onderline, Ron's son, is the chief operating officer. (*Id.*) The corporate office, located in Kalamazoo, is run by Becky Russon, who works as the general manager

for the company. (*Id.*, 16-17.) In 2003, Defendant formed a business in Nashville, Tennessee that existed until 2008, when it was purchased by another ambulance company.[1] (*Id.*, 19-20.) Plaintiff was hired by Carol Reiter in 2005 as a collections agent. (Walters Dep., 16-17.) Plaintiff's immediate supervisor was Ms. Russon, although she was assigned tasks by Carol Reiter.[2] (*Id.*, 18-19.) Plaintiff also assisted Phyllis Blevins and Cindy Deanor, from time to time. (Walters Dep., 19.) When Plaintiff was hired, she was primarily responsible for collections relating to Defendant's Tennessee subsidiary. (*Id.*, 20.) Plaintiff would make telephone calls and mail letters regarding bills past due, resubmit those bills incorrectly billed, review reports, and call insurance companies. (*Id.* 17.) Plaintiff testified Rieter also asked her to handle letters from Medicare "regarding overpayments, making sure that they were being billed appropriately." (*Id.*, 18.)

The parties agree Defendant received payment for services from a variety of private and public sources, including Medicare and Medicaid. (Def. Br. 2; Pl. Br. 2.) The parties also agree that overpayments for services would occur. (Def. Br. 2; Pl. Br. 2.) Defendant acknowledges it is obligated, by law to make reimbursements when overpayments are made.[3] (Def. Br. 2.) Defendant had an internal form, a refund request form, which would be completed by the billing clerk in order to reimburse an entity for overpayments. (Def. Ex. G.) Typically, the form would be completed by Carol Reiter or Cindy Deanor, and then approved by Tim Onderlinde. (Onderlinde Dep., 54-55.) No one individual in the office was responsible for refunds. (Walters Dep., 25.) On occasion,

---

[1]Tim Onderlinde describes the Nashville business "an independent business, it was a subsidiary, but it was part of Pride Care." (*Id.*, 19.)

[2]Ms. Russon is Ms. Reiter's daughter. (Reiter Dep., 12.)

[3]Although this action alleges a whistleblower claim, Plaintiff has curiously never identified the law or regulation allegedly violated. Given Defendant's acknowledgment of its legal obligation to repay overpayments, Plaintiff's oversight does not impact the pending motion.

Plaintiff would process refunds for Medicare or Medicaid when those entities gave notice of an overpayment.  (*Id.*)

Plaintiff first began having concerns about Defendant's reimbursement system in early 2006.  (Walters Dep., 48.)  Initially, she noticed overpayments by individuals.[4]  (*Id.*)  Plaintiff would fill out the refund form and submit those for approval.  (*Id.*, 49.)  At some point, Plaintiff was told by Blevins and Deanor to stop writing refunds unless someone was calling about the money.  (*Id.*)  According to Plaintiff, the order to stop writing those refunds came from Tim Onderlinde.  (*Id.*)  Plaintiff interpreted the directive as applying to refunds for both private sources and public sources.  (*Id.*, 54.)  Plaintiff complained about the reimbursement policy to Deanor, Blevins, Reiter, and Joyce Feenstra, another member of the senior staff.  (*Id.*, 55.)  At some point, as Plaintiff's responsibilities expanded, she became concerned about overpayments by public sources, including Medicare and Medicaid.  (Walters Dep., 57-58.)  Heather Simmons, who was hired after Plaintiff as a billing and collections agent, testified she too was told by Deanor that she should not be giving or initiating refunds for overpayments unless the entity owed money asked for a refund.  (Simmons Dep., 11.)

On April 18, 2008, Plaintiff called Tennessee Medicaid about overpayments it made to Defendant.  (Walters Affidavit; Walters Dep., 84.)  According to Plaintiff, the individual she spoke with directed her to fill out forms to allow Medicaid to automatically recoup the overpayments.  (Walters Affidavit.)

In June 2008, Plaintiff asked Tim Onderlinde whether he wanted to establish electronic payments by Tennessee Medicare for services provided in Tennessee.  Plaintiff asserts she informed

---

[4]These overpayments were made by private, not public sources.  (Walters Dep. at 48, 52, and 57.)

Tim Onderlinde that electronic billing was available "and he said he would like to sign up for the electronic payment so he could get them just the same as he did for Kalamazoo." (Walters Dep., 76.) Plaintiff claims Tim signed the Medicare payment authorization form. (*Id.*, 71-72, 76.) Onderlinde acknowledged Plaintiff approached him about signing up for the automatic payment system for Tennessee Medicare. (Onderlinde Dep., 71.) Onderlinde denies ever having agreed that the electronic billing form should be submitted for Tennessee Medicare. (*Id.* 80-81.) Onderlinde explained to Plaintiff he did not want to sign up because when the Kalamazoo office signed up for the automatic payment system, it resulted in a lengthy transition. (*Id.* 70-71.) Onderlinde further testified Plaintiff later informed him someone would have to complete the transition to automatic payments in Tennessee, because she had contacted Medicare and provided them with some initial information about Defendant's address in Nashville. (*Id.*, 71-72) Because the address Plaintiff gave did not match up with what Tennessee Medicare had on record, Pride Ambulance was required to complete a new application form for Medicare.[5] (*Id.*) Onderlinde testified Plaintiff showed him a letter from Tennessee Medicare that threatened to terminate Defendant's Medicare license if "we didn't get our information in a timely fashion." (*Id.*, 73.)

In July 2008, Reiter discovered Defendant was not receiving payments from Tennessee Medicaid because Tennessee was automatically recouping its money. (Reiter Dep., 31.) On July 30, 2008, Tim Onderlinde claims he became aware that Tennessee Medicaid was automatically taking offsets from Defendant's account while reading benefits documents provided to him by Reiter

---

[5]Defendant initially had one location in Nashville, which was reflected on the Medicare license paperwork. When Plaintiff contacted Medicare about the automatic payments, she gave Medicare an address for a second location where Defendant was providing services in Nashville, even though the billing location did not change. As a result of this second address, Tennessee Medicare required Defendant to fill out a new application. (*See* Onderlinde Dep., 75-80.)

and Russon. (Onderlinde Dep., 61.) Reiter informed Onderline that day that Plaintiff had taken it upon herself to do the recoupments. (*Id.*, 61; Reiter Dep., 35.)

Onderlinde and Plaintiff met, with Reiter, to discuss Plaintiff's conduct. (Onderlinde Dep., 94; Walters Dep., 69.) Plaintiff described the meeting as "a witch-hunt," "they were hunting for stuff to write me up on." (Walters Dep., 72.) During the meeting, several of Plaintiff's decisions and actions were discussed. Plaintiff was accused of causing another person's computer to crash. (Walters Dep., 71.) Plaintiff was accused of submitting paperwork to Tennessee Medicaid for automatic reimbursements without proper authorization. (*Id.*) Plaintiff was accused of filling out forms for automatic payments by Tennessee Medicare without authorization. (*Id.*, 71-72.) Onderlinde asked Plaintiff for copies of the documents she filled out allowing Tennessee Medicaid to automatically recoup overpayments. (Onderlinde Dep., 95; Walters Dep., 73-74.) Plaintiff did not keep a copy of the forms she filled out (Walters Dep., 72-73), but was able to secure a blank copy of the form she used (Walters Dep., 74; *see* Def. Ex. J).

On July 31, 2008, at the direction of Onderlinde, Russon presented Plaintiff with a disciplinary letter, a Termination Warning Letter. (Walters Dep., 74; Russon Dep., 35-36; Pl. Ex 6 - Termination Warning Letter.) The letter was dated July 30 and generally covered the same issues from Plaintiff's meeting with Onderlinde the day before. (Termination Warning Letter.) The letter accused Plaintiff of undertaking tasks without getting the necessary prior approval from management, including enrolling Defendant with Tennessee Medicare for automatic billing, downloading upgrades to computers and causing the computers to crash, and refunding money to insurance companies. (*Id.*) As a result of her conduct, Plaintiff needed to check with Reiter on a daily basis for her assignments. (*Id.*) At the end of the semester, Plaintiff's flexible schedule

privileges would be revoked so that her performance could be monitored. (*Id.*) Plaintiff signed the form, after she added some language at the bottom. Plaintiff stated Onderlinde agreed with the decision to allow Tennessee Medicare to do automatic payments until the State had a problem with the addresses of Defendant's locations. (*Id.*)

On August 1, 2008, around 5:00 p.m., Plaintiff went to Onderlinde's office and presented a letter that complained generally about Reiter and Russon. (Onderlinde Dep., 100; Def. Ex. N.) Plaintiff also had a box of documents which she alleged Reiter had failed to complete in order for Defendant to receive payments. (Onderlinde Dep., 100-101.) Onderlinde testified Plaintiff stated she was going to take the company down.[6] (*Id.*, 103, 106-107.) Plaintiff then told Onderlinde that she had contacted the Medicare Hotline. (*Id.*, 103.) Plaintiff testified she told Onderlinde she called Medicare back in April. (Walters Dep., 89.) Plaintiff concedes this was the first time she told Onderlinde about her contact with Medicare. (*Id.*) Onderlinde admits he told Plaintiff she was cold-hearted. (*Id.* 106.) Onderlinde denies making a decision to terminate Plaintiff. (*Id.*, 109-110.)

On Monday, August 4, 2008, Plaintiff called in sick and did not report to work. (Russon Dep. 44.) Plaintiff alleges she went to see a doctor. (Walters Dep., 123-124.) She also went to the doctor's office on Wednesday, August 6. (*Id.*, 123.) That same day, August 6, Dalton Medical Practice faxed a FMLA form to Defendant on behalf of Plaintiff.[7] (Russon Dep., 44-45; Kehl Affidavit; Pl. Ex. 9.) The physician assistant at Delton Medical Practice, John Kehl, avers he saw Plaintiff on August 4, August 6, August 20, and September 5. (Kelh Affidavit.) On August 20, Mr.

---

[6]Plaintiff denies making this statement. (Walters Dep., 96.)

[7]Defendant asserts the FMLA form was faxed to them on August 11. In support, Defendant cites the form itself, which is dated August 11. (Def. Ex. T.) The date the FMLA certificate was sent is not a material dispute.

Kehl filled out a form stating Plaintiff was medically unable to work from August 4 through August 22, and would return to work on August 25.  (Pl. Ex. 10.)

On Monday, August 25, Plaintiff returned to work.  (Russon Dep., 51.)  When she arrived, Russon presented Plaintiff with a letter, dated August 20, giving Plaintiff the day off with pay so that Defendant could meet with counsel "to ensure that both the company's interests and [Plaintiff's] rights are protected."  (Pl. Ex. 11; Russon Dep. 51-52.)  As instructed, Plaintiff called Russon later that day, and Russon informed Plaintiff she was being given time off with pay and should report to work on Wednesday, September 3.  (Russon Dep., 52; Pl. Ex. 12 - Personnel File Note.)  Russon told Plaintiff that Plaintiff was being reassigned as a dispatcher in Russon's area and because she, Russon, would be on vacation through the holiday weekend, Plaintiff should not report to work until September 3.  (Russon Dep., 52.)  Russon told Plaintiff her FMLA paperwork needed some additional clarification, which would be covered when the two returned to work.  (*Id.*, 53.)

Plaintiff reported to work on September 3.  (Walters Dep., 131-32; Russon Dep., 57.)  Russon presented Plaintiff with another letter regarding her work status and FMLA request.  (Dep. 58; Walters Dep., 131.)  The letter explained that Plaintiff was being reassigned to dispatch, but would have the same wages and benefits.  (Pl. Ex. 13.)  The letter justified the reassignment because Plaintiff had "acted outside the realm of [her] authority thus causing the company significant harm by [her] failure to keep records and because there has been a breakdown of trust between the company and [Plaintiff.]."  (*Id.*)  The letter acknowledged Defendant received an FMLA form from the Delton Medical Center.  (*Id.*)  The letter asserts the FMLA form did not provide an adequate legal basis for an FMLA leave.  (*Id.*)  Plaintiff was asked to complete medical authorization forms allowing Defendant "to directly discuss with your medical provider the deficiencies in the form, and

to establish an FMLA qualified basis for your leave." (*Id.*) The letter explained Plaintiff had the right not to grant the authorizations, but if the authorizations were not given, Plaintiff would be given specific questions, which would have to be answered by the medical providers in order to establish that the FMLA leave was qualified. (*Id.*) Plaintiff refused to sign the form. (Walters Dep., 131.) Plaintiff did not sign the authorizations. (Russon Dep., 59.)

The next day, September 4, Russon presented Plaintiff with another document which addressed the deficiencies in the earlier FMLA form. (Walters Dep., 133; Pl. Ex. 14.) The document stated "[t]hese deficiencies must be rectified in order for your leave to be considered FMLA qualified." (Pl. Ex. 14.) The document then identified, with specific detail, the additional information and clarifications Defendant sought. (*Id.*)

On Friday, September 5, Plaintiff took the document identifying the list of deficiencies to the Delton Medical Center. (Walters Dep., 135.) Plaintiff explained to Mr. Kehl that her employer did not find the earlier form sufficient. (Kehl Affidavit.) Mr. Kehl revised the form, adding detail and provided the revised form to Defendant. (*Id.*) The same day, someone called Delton Medical Center to ask if Plaintiff had appeared at the office for a medical appointment. (*Id.*) The medical center declined to answer the question because Plaintiff had not authorized it to do so. (*Id.*) According to Plaintiff, Russon was the person who called the medical center and the medical center referred the call to its HIPAA officer. (Walters Dep., 127-128, 136.) Onderlinde testified Russon called the medical center, but no one would answer her question because of HIPAA regulations. (Onderlinde Dep., 119-120.) Russon and Onderlinde agreed Onderlinde told Russson to call the medical center. (Russon Dep., 77; Onderlinde Dep., 147.) The purpose of the call was to find out if Plaintiff had a medical appointment because she had not shown up for work. (Russon Dep., 77-

78; Onderlinde Dep., 120-121, 146-147.)

Plaintiff was out sick on Monday, September 8. On Tuesday, September 9, 2008, Plaintiff tendered her resignation. (Walters Dep., 136-137.) In her letter of resignation, Plaintiff states she is "resigning under duress caused by Pride Care forcing my resignation due to all recent circumstances." (Pl. Ex. 15.) Several days after Plaintiff submitted her letter of resignation, Defendant received a revised FMLA form from Delton Medical Center. (Russon Dep., 83, 89-91.)

ANALYSIS

### A. MICHIGAN'S WHISTLEBLOWERS' PROTECTION ACT

Section 2 of the Whistleblowers' Protection Act (WPA) provides

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

MCL § 15.362. "The WPA as a remedial statute, is to be liberally construed to favor the persons the Legislature intended to benefit." *Chandler v. Dowell Schlumberger, Inc.*, 456 Mich. 395, 406, 572 N.W.2d 210, 215 (1998) (citing *Shallal v. Catholic Soc. Servs. of Wayne County*, 455 Mich. 604, 611, 566 N.W.2d 571, 575 (1997)). Actions filed under the WPA are analyzed under the burden-shifting framework for retaliatory discharges under Michigan's Civil Rights Act. *Taylor v. Modern Eng'g, Inc.*, 252 Mich. App. 655, 659, 653 N.W.2d 625, 628 (2002) (citing *Roulston v. Tendercare (Michigan), Inc.*, 239 Mich. App. 270, 280-81, 608 N.W.2d 525 (2000) (per curiam)). The plaintiff must first allege a *prima facie* case under the WPA. *Id.* Once a *prima facie* case is

established, the burden shifts to the defendant to show a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* The burden then shifts back to the plaintiff to demonstrate how the proffered reason is a pretext for discrimination. *Id.*

In order to establish a *prima facie* case for retaliation under the WPA, a plaintiff must show (1) he or she was engaged in a protected activity as defined by the WPA, (2) he or she suffered an adverse employment action, and (3) a causal connection between the protected activity and the adverse employment action. *Chandler*, 572 N.W.2d at 212 (citing *Shallal*, 566 N.W.2d at 574). Under the first element, "[t]here is no sliding scale in the WPA based on the employer's intent. Regardless of the quantum of proof of the employer's ill will, the act requires an employee to prove he was engaged in protected activity." *Id.* at 213. Under the WPA, protected activity includes reporting to a public body a violation of a law, regulation or rule of the State of Michigan or the United States.[8] MCL § 15.362; *Chandler*, 572 N.W.2d at 212.

Whether an employee was constructively discharged is relevant to the second element of a WPA action. A constructive discharge is not itself a violation of the WPA, and is not a cause of action. Rather, it is "the culmination of the alleged wrongful actions that would cause a reasonable person to quit employment. Constructive discharge is a *defense* that a plaintiff interposes to preclude the defendant from claiming that the plaintiff voluntarily left employment." *Joliet v. Pitoniak*, 475 Mich. 30, 41, 715 N.W.2d 60, 68 (2006) (emphasis in original). A constructive discharge occurs when "'an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation or, stated differently, when

---

[8]Plaintiff does not allege she was about to report a violation or that she was asked to participate in an investigation by a public body.

working conditions become so difficult or unpleasant that a reasonable person in the employee's shoes would feel compelled to resign.'" *Vagts v. Perry Drug Stores, Inc.*, 204 Mich. App. 481, 487, 516 N.W.2d 102, 105 (1994) (per curiam) (quoting *Mourad v. Auto. Club Ins. Ass'n*, 186 Mich. App. 715, 721, 465 N.W.2d 395 (1991)); *see also Hammond v. United of Oakland, Inc.*, 193 Mich. App. 146, 151, 482 N.W.2d 652, 654 (1992) (citing *Mourad*).

Under the third element of a *prima facie* case, Michigan courts, starting with *Kaufman & Payton, P.C. v. Nikkila*, 200 Mich. App. 250, 257, 503 N.W.2d 728, 732 (1993), have held that employers are entitled to objective notice of a report or a threat of a report by the whistleblower. *See Roulston*, 608 N.W.2d at 529; *Roberson v. Occupational Health Ctrs. of America, Inc.*, 220 Mich. App. 322, 326, 559 N.W.2d 86, 88 (1997) (per curiam); *see also Jennings v. County of Washtenaw*, 475 F.Supp.2d 692, 713 (E.D. Mich. 2007) (citing *Kaufman*); *Smith v. Geniva Health Servs. (USA), Inc.*, 296 F.Supp.2d 758, 762 (E.D. Mich. 2003). In addition, Michigan courts have held that temporal proximity between the protected activity and the adverse employment act, standing alone, is insufficient to establish a causal connection. *West v. Gen. Motors Corp.*, 469 Mich. 177, 186, 665 N.W.2d 468, 472-73 (2003) (per curiam) (citing both federal and state cases); *Taylor*, 653 N.W.2d at 630; *see also Cooney v. Bob Evans Farms, Inc.*, 645 F.Supp.2d 620, 631 (E.D. Mich. 2009) (noting, in a footnote, the Sixth Circuit Court of Appeals cases finding that temporal proximity can be sufficient evidence of a causal connection are not binding authority and that Michigan law controls); *Jennings*, 475 F.Supp.2d at 713.

If the plaintiff succeeds in establishing a *prima facie* case for retaliatory action, the burden shifts to the employer to articulate a legitimate business reason for its conduct. *Roulston*, 608 N.W.2d at 530. "'The defendant need not persuade the court that it was actually motivated by the

proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of material fact as to whether it discriminated against the plaintiff.'" *Forner v. Robinson Twp. Bd.*, No. 287384, 2009 WL 2515742, at * 8 (Mich. Ct. App. Aug. 18, 2009) (per curiam) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).

Finally, the plaintiff is afforded an opportunity to establish that the proffered reasons were not the defendant's true reasons, but a pretext for discrimination. *Roulston*, 608 N.W.2d at 530. The employee can prove pretext "either directly by persuading the court that a retaliatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* (citing *Hopkins v. Midland*, 158 Mich. App. 361, 380, 404 N.W.2d 744 (1987)). The plaintiff can show pretext by establishing the employer's proffered reasons (1) have no basis in fact, (2) did not actually motivate the decision, or (3) were insufficient to justify the decision. *Dubey v. Stroh Brewery Co.*, 185 Mich. App. 561, 565-566, 462 N.W.2d 785, 760 (1990) (per curiam) (involving an age discrimination claim and citing *Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 266 (6th Cir. 1986)). Where the plaintiff's evidence of a causal connection between the protected activity and the retaliatory act is limited to the temporal proximity of the two events, the plaintiff has not created a genuine issue of material fact on the issue of pretext. *Taylor*, 653 N.W.2d at 630.

### 1. MEDICARE HOTLINE

Plaintiff has not established a *prima facie* case under the whistleblower statute related to her call to the Medicare Hotline. The parties do not dispute Plaintiff called Medicare some time in April 2008. Neither do the parties dispute that on August 1, 2008, Plaintiff informed Tim Onderlinde that she called the Medicare Hotline. Defendant does not argue the telephone call does not constitute

protected activity. Defendant questions whether Plaintiff can establish either of the other two prongs of a *prima facie* case under the WPA. Plaintiff asserts she can establish a *prima facie* case for a whistleblower claim because, after Onderlinde learned about the call to Medicare, she was moved from collections to a dispatch position.

Plaintiff has not established that she suffered an adverse employment action occurring after she informed Mr. Onderlinde that she called the Medicare Hotline. Plaintiff received the discipline letter before she told Onderlinde about her call to Medicare. The letter stated "[e]ffective immediately there will be some changes of how you do your job, your job responsibilities and who you report to." (Termination Warning Letter.) The day <u>after</u> she received the disciplinary letter, Plaintiff informed Onderlinde that she called the Medicare Hotline back in April. Plaintiff did not return to work for another three weeks, and when she eventually did return, she was reassigned from collections to dispatch. The dispatch office was located upstairs, while the collections office was located downstairs. (Walters Dep., 43.) In her affidavit, Plaintiff claims the reassignment was "demeaning," "stressful," and she "felt punished and ostracized." (Walters Affidavit.)

Plaintiff relies on *Burlington N. & Santa Fe Ry Co. v. White*, 548 U.S. 53 (2006) for the proposition that a reassignment of job duties can constitute impermissible retaliation. In *Burlington*, the Court held "[w]hether a particular reassignment is materially adverse depends on the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* at 71 (citation and quotation marks omitted). Plaintiff has not established that a reasonable person, in her circumstances, would consider the reassignment "materially adverse." Plaintiff's subjective feelings about the transfer are not objective evidence that the transfer constituted an adverse employment action. Plaintiff has not

compared the two positions, other than to point out that one was upstairs and one was downstairs. In *Burlington*, the Court noted the jury had "considerable evidence" that one job was more arduous and dirtier than the other, one job required more qualifications and had greater prestige than the other, and one job was "objectively considered a better job." *Id.* Plaintiff's complaints about her reassignment do not describe the sort of intolerable conditions which a reasonable person would deem an adverse employment action or a constructive discharge. *See Donahoo v. Master Data Ctr.*, 282 F.Supp.2d 540, 550 n. 3 (E.D. Mich. 2003) (involving allegations of a constructive discharge and retaliation under Michigan's Disabilities Civil Rights Act, finding "[n]one of Defendant's actions created a working environment that would have been intolerable to a reasonable person. She claims that her trouble getting along with co-workers and her supervisors' [sic] scrutinizing her work more harshly than other employee's [sic] work, and working fixed hours instead of flex-time were the intolerable conditions, but those are insufficient to compel a reasonable person to quit.").

Furthermore, Plaintiff cannot establish the causally connected prong with regard to her telephone call to the Medicare Hotline. The letter initiated disciplinary action against Plaintiff. The letter does not identify the extent of the discipline to be imposed on Plaintiff, because it does not identify how Plaintiff's responsibilities would change. Once disciplinary action has been initiated, a plaintiff cannot insulate himself or herself by performing some protected activity, or, in this case, informing her employer for the first time about a protected activity. *See Cooney*, 645 F.Supp.2d at 631-32 (holding, on the plaintiff's WPA claim, she could not establish the causation prong because management had already initiated disciplinary action against the plaintiff before she threatened to initiate the protected activity); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII

suit has been filed, and their proceedings along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."); *Mason v. Sash & Door Co.*, 26 F.App'x 531, 535 (6th Cir. 2002) (involving a Title VII age discrimination claim, "Mason failed to establish a causal connection between the protected activity and the adverse employment action because the evidence showed that Mason knew his position was in jeopardy several months before Mason wrote his letter purportedly accusing Huttig of age discrimination.")

### 2. TENNESSEE MEDICAID

Plaintiff has established a *prima facie* case under the whistleblower statute related to her telephone call to Tennessee Medicaid. Defendant alleges the change in the manner in which Medicaid was reimbursed does not constitute a report and is therefore not protected activity. Defendant asserts Plaintiff merely complete forms by checking a box allowing an automatic recoupment to occur. Defendant conveniently overlooks that Plaintiff first called Tennessee Medicaid and spoke with representatives to report overpayments. Plaintiff changed the manner of reimbursement at the direction of Tennessee Medicaid. This court cannot overlook the fact that Plaintiff was directed by management not to refund known overpayments until the individual or entity requested the refund. Because Pride Ambulance was aware of overpayments, and was ordering its employees not to refund public and private funds to which defendant was not entitled until requested to do so, Plaintiff's telephone call to Tennessee Medicaid to report overpayments constitutes a report of at least suspected illegal activity. At the minimum, there is a genuine issue of material fact whether the telephone call constitutes a report under the WPA.

Plaintiff has established the second and third prongs of a *prima facie* case related to her Medicaid call. Defendant does not suggest Plaintiff cannot establish either of the other two prongs.

Defendant had objective evidence of the automatic recoupments before it disciplined Plaintiff. Defendant took away a privilege of Plaintiff's employment when it eliminated her flexible schedule for future semesters. One of the reasons cited by Defendant for disciplining Plaintiff in the Termination Warning Letter was that Plaintiff refunded money to insurance companies without getting prior approval. This statement, along with the timing of the letter after Defendant learned about the automatic recoupments, is sufficient to establish a causal connection.

Defendant has established legitimate, nondiscriminatory reasons for its decisions regarding Plaintiff's job responsibilities. The Termination Warning Letter identifies several different concerns Defendant had with Plaintiff, each concern relates to actions taken by Plaintiff without first consulting management.

Plaintiff has established a genuine issue of material fact with regard to pretext. Other than the change in Medicaid billing, the concerns raised in the Termination Warning Letter occurred sometime before July 30, when Defendant learned about the Medicaid recoupment change Plaintiff initiated. Plaintiff was not disciplined or warned about possible discipline for any of those other concerns at the time they occurred. Plaintiff also disputes the veracity of the other concerns raised in the letter. Plaintiff alleges Onderlinde agreed to authorize electronic payments for Medicare. (Walters Dep., 76.) Plaintiff alleges she did not need authorization to do routine upgrades to the computers, and the reason a computer consultant was called was because Heather Simmons had uploaded a virus on to her computer. (*Id.*, 79.)

B. FAMILY AND MEDICAL LEAVE ACT

Under the FMLA, qualifying employees are entitled to twelve weeks of unpaid leave each year if, among other things, the employee has a "serious health condition that makes the employee

unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). *See Cavin v. Honda of America Mfg., Inc.*, 346 F.3d 713, 719 (2003). There are two theories of recovery under the FMLA, an interference or entitlement theory and a retaliation or discrimination theory. *Hunter v. Valley View Schs.*, 579 F.3d 688, 691 (6th Cir. 2009); *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2008). The interference or entitlement theory arises from 28 U.S.C. § 2615(a)(1), which provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise or attempt to exercise, any right provided under [the FMLA]." *See Daugherty*, 544 F.3d at 707. The retaliation or discrimination theory arises from 28 U.S.C. § 2615(a)(2), which provides "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against an individual for opposing any practice made unlawful by [the FMLA.]." *See Daugherty*, 544 F.3d at 707. The Code of Federal Regulations (CFR) prohibits employers "from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights." 29 C.F.R. § 820.220(c).

> Any "right" to take unpaid leave would be utterly meaningless if the statute's bar against discrimination failed to prohibit employers from considering an employee's FMLA leave as a negative factor in employment decisions. Interpreting § 2615(a)(2)'s ban on discrimination in a manner that would permit employers to fire employees for exercising FMLA leave would undoubtably run contrary to Congress's purpose in passing the FMLA.

*Bryant v. Dollar Gen. Corp.*, 538 F.3d 394, 401 (6th Cir. 2008).

To establish a claim under the interference theory, a plaintiff must show (1) he or she was an eligible employee, (2) the defendant is an employer, (3) the employee was entitled to leave under the FMLA, (4) the employee gave the employer notice of his or her intention to take leave, and (5) the employer denied the employee benefits to which he or she was entitled. *Cavin*, 346 F.3d at 719.

An employer may require an employee to provide a doctor's certification confirming

> the existence of a serious health condition.  29 U.S.C. § 2613(a).  A doctor's
> certification of a serious health condition is sufficient if it states (1) the date on
> which the serious health condition began, (2) the probable duration of the condition,
> (3) the appropriate medical facts within the health care provider's knowledge, and
> (4) a statement that the employee is unable to perform her job duties.  *Brenneman* [*v.
> MedCentral Health Sys.*, 366 F.3d 412, 422 (6th Cir. 2004)] (citing 29 U.S.C. §
> 2613(b).    While "the medical certification provided by the employee is
> presumptively valid if it contains the required information and is signed by the health
> care provider," the employer may overcome this presumption by showing that "the
> certification is invalid or inauthentic."  *Harcourt v. Cincinnati Bell Tel. Co.*, 383
> F.Supp.2d 944, 955-956 (S.D. Ohio. 2005) (citing 29 C.F.R. § 825.307(a)).

*Novak v. MetroHealth Ctr.*, 503 F.3d 572, 578 (6th Cir. 2007).  *See also Verkade v. United States Postal Serv.*, 14 Wage & Hour Cas.2d 922, 2009 WL 279048 * 7 (W.D. Mich. Feb. 5, 2009) (Neff, J.)  When an employer finds the FMLA certification form incomplete or inadequate, the employer has a duty to inform the employee of the deficiency and provide the employee with a reasonable opportunity to cure the deficiency.  *Novak*, 503 F.3d at 579.  An employer who is not satisfied with a certification has the option, but is not required, to have the eligible employee obtain the opinion of a second health care provider.  *Id.*

A plaintiff may establish an FMLA discrimination or retaliation claim by either direct or circumstantial evidence.   Where an employee offers indirect or circumstantial evidence of discrimination in order to establish a *prima facie* case, the employee must show (1) he or she engaged in a statutorily protected activity, (2) he or she suffered an adverse employment action, and (3) a causal connection between the protected activity and the adverse employment action.  *Daughtery*, 544 F.3d at 707 (citing *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007)).  When a plaintiff presents evidence of a *prima facie* case using circumstantial evidence, courts apply the familiar burden shifting analysis.  *Bryson*, 498 F.3d at 570; *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001).  Initially, the plaintiff must present evidence "from which a

reasonable jury could conclude that the plaintiff suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." *Bryson*, 498 F.3d at 570 (quoting *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 363 (6th Cir. 2007)). The Sixth Circuit has held, for a FMLA claim, the "proximity in time between the protected activity and the adverse employment action may constitute evidence of a causal connection." *Bryson,* 498 F.3d at 571 (citing *Skrjanc,* 272 F.3d at 315 and *Chandler v. Specialty Tires of America*, 283 F.3d 818, 826 (6th Cir. 2002)).

If the plaintiff satisfies the elements of a *prima facie* case, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. *Bryson*, 498 F.3d at 570 (citing *Macy*, 484 F.3d at 364). If the defendant produces such evidence, the burden shifts back to the plaintiff to show that the reason proffered by the defendant is a pretext for unlawful discrimination. *Id.* (citing *Macy*, 484 F.3d at 364). A plaintiff can demonstrate the proffered reason is pretextual any of three ways: (1) showing the proffered reason was false; (2) showing the proffered reason was insufficient to cause the adverse action; or (3) showing the proffered reason was not the actual reason for termination. *Joostberns v. United Parcel Servs., Inc.*, 166 F.App'x 783, 794 (6th Cir. 2006) (citing *Manzer v. Diamond Shamrock Chems. Inc.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). Although the burden of production shifts between the parties, the burden of persuading the trier of fact that the defendant impermissibly discriminated against the plaintiff remains at all times with the plaintiff. *Bryson*, 498 F.3d at 570 (quoting *Macy*, 484 F.3d at 364 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981))).

Plaintiff has not established a *prima facie* case for her claim under the FMLA. In her

response brief, Plaintiff abandons any retaliation claim under the FMLA.[9]  Plaintiff cannot establish

that ~~Plaintiff~~ *Defendant* interfered with or otherwise denied any requested employee benefits to

which she was entitled.  Defendant never denied Plaintiff any FMLA leave.  When Plaintiff

resigned, her FMLA request was still being processed and Defendant had not yet received the

additional information it legitimately requested.  In addition, any adverse employment actions had

already been completed when Plaintiff first requested the FMLA leave.  Given the sparse

information contained in the initial FMLA certification, Defendant acted within the law when it

requested additional information and clarification.

CONCLUSION

Defendant Pride Ambulance is entitled to summary judgment on Plaintiff's whistleblower

claim related to her telephone call to Medicare.  Defendant is also entitled to summary judgment on

Plaintiff's claim under the FMLA.  Plaintiff, however, has established a *prima facie* case for

discrimination under the whistleblower act related to her telephone call to Medicaid.  Plaintiff has

also created a genuine issue of material fact whether the reasons proffered by Defendant were

pretext.

---

[9]"Because Ms. Walters can easily prove her interference claim, she needs not address her
retaliation claim, which is redundant."  (Pl. Br. 29.)

ORDER

For the reasons provided in the accompanying opinion, Defendant Pride Ambulance Company's motion (Dkt. No. 33) is **GRANTED IN PART AND DENIED IN PART.** Defendant's motion with regard to Plaintiff's FMLA claim is GRANTED and the FMLA claim is DISMISSED WITH PREJUDICE. Defendant's motion with regard to Plaintiff's Michigan Whistleblowers' Protection Act claim is GRANTED regarding Plaintiff's telephone call to Medicare and DENIED regarding Plaintiff's telephone call to Medicaid. Plaintiff's Whistleblowers' Protection Act claim with regard to her telephone call to Medicare is DISMISSED WITH PREJUDICE.

**IT IS SO ORDERED.**

Date:   April 8, 2010                                    /s/ Paul L. Maloney
                                                         Paul L. Maloney
                                                         Chief United States District Judge